IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

JOHN CORDES and LINDSEY )
CORDES, )
 )
Plaintiffs, )
 )   Case No. 3:20-CV-10-MAB
vs. )
 )
CENTERS FOR REPRODUCTIVE )
MEDICINE AND WELLENSS, LLC, )
D/B/A VIOS FERTILITY, VIOS )
FERTILITY INSTITUTE CHICAGO, )
LLC, and ADVAGENIX, LLC, )

Defendants.

## MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

This matter is before the Court on three motions: (1) Plaintiffs' motion to strike opinions of Dr. Cotter (Doc. 129); (2) Plaintiffs' motion to strike opinions of Dr. Sanfilippo (Doc. 130); and (3) Defendants' joint *Daubert* motion to exclude the testimony of Nancy Bond and Dr. Wassman (Doc. 131). For the reasons set for below, the Court GRANTS in part and DENIES in part Plaintiffs' motions to strike (Docs. 129, 130) and DENIES Defendants' joint *Daubert* motion (Doc. 131).

## BACKGROUND

In 2016, Plaintiff Lindsey Cordes suffered a miscarriage (Doc. 44, p. 7). A chromosome analysis performed on tissue from the fetus revealed an abnormal chromosome pattern (*Id.*). After further testing, Plaintiff John Cordes was diagnosed with a genetic defect, known as a four-way translocation, which created a high likelihood that

his sperm cells would contain an unbalanced amount of chromosome material (*Id.*, *see also* Doc. 129). It is believed that John Cordes' four-way translocation was the cause of the miscarriage (Doc. 44 at p. 7).

In February 2017, Plaintiffs John and Lindsey Cordes (collectively, "Plaintiffs") pursued fertility treatment with Dr. Amber Cooper[1] at the Center for Reproductive Medicine and Wellness LLC, d/b/a, Vios Fertility, and Vios Fertility Institute Chicago, LLC (collectively, the "Vios Defendants") in St. Clair County, Illinois (*Id.* at pp. 1-2). At an in-person consultation in Illinois, Dr. Cooper and Plaintiffs discussed the miscarriage, John Cordes' genetic defect, and the possibility of using an in vitro fertilization process and pre-implantation genetic screening to determine if an embryo had extra or missing chromosome material (*Id.* at p. 8). While the parties dispute the extent to which Dr. Cooper conveyed the potential for inaccurate testing results including false negatives to Plaintiffs, Defendants have not been able to provide documentation or proof of written informed consent (Doc. 128, p. 6; Doc. 129-1, p. 4; Doc. 148, pp. 2-4; Doc. 150, p. 3).

Shortly after the consultation with Dr. Cooper, Plaintiffs began the in vitro fertilization process (Doc. 44 at p. 8). After thirteen of Plaintiffs' embryos were fertilized, six embryos were biopsied and sent to Defendant Advagenix for genetic screening (*Id.*). Plaintiffs did not have any direct conversations with Advagenix and Advagenix neither directly obtained informed consent from Plaintiffs nor confirmed that Dr. Cooper obtained informed consent from Plaintiffs (Doc. 129, p. 2; Doc. 148, p. 2). After receiving

---

[1] Dr. Cooper was previously named as a defendant in this action (*see* Doc. 1). Plaintiffs voluntarily dismissed Dr. Cooper without prejudice in April 2020 (Doc. 41).

and testing the embryos at its Maryland laboratory, Advagenix determined two embryos did not appear to have any genetic abnormalities (Doc. 44, p. 8; Doc. 53, p. 11; Doc. 129, p. 2). As a result, on May 15, 2017, Dr. Cooper implanted Lindsey Cordes with both "normal" embryos (Doc. 129, p. 2). An ultrasound later revealed one of the embryos survived (Doc. 44 at p. 9). Thereafter, Lindsey Cordes gave birth to Hannah Cordes on January 19, 2018, in St. Louis, Missouri (*Id.*). Hannah was born with numerous physical anomalies and subsequent testing revealed a genomic imbalance that was presumably a result of John Cordes' four-way translocation (*Id.* at pp. 9-10).

Plaintiffs filed this action on January 3, 2020, alleging Defendants committed medical malpractice by breaching the duty to provide care and treatment to Plaintiffs in accordance with that of a reasonably competent medical provider through their negligent acts and omissions (Doc. 1). Specifically, as stated in their second amended complaint, Plaintiffs claim they "underwent the pre-implantation genetic counseling for the primary purpose of avoiding a child with an unbalanced translocation." (Doc. 44 at p. 10). Plaintiffs assert that Defendants failed to adequately apprise them of the inaccuracy of testing and the potential risk that the allegedly "normal" embryos would possess the genetic deficiencies Plaintiffs sought to avoid (*Id.* at pp. 10-11). Plaintiffs contend they relied upon Defendants' representations in deciding to move forward with the implantation and they would "have avoided conception of the pregnancy but for the actions and/or inactions of Defendants[.]" (*Id.* at p. 11).

During the course of discovery, the parties disclosed their experts and corresponding expert reports to one another (Doc. 129, p. 2; Doc. 130, p. 2; Doc. 131, pp.

1-2). Notably, Advagenix retained Dr. Phillip Cotter as an expert witness (*see* Docs. 129-1; 129-2; 129-3) and the Vios Defendants retained Dr. Joseph Sanfilippo as an expert witness (Docs. 130-1; 130-2; 130-3). Meanwhile, Plaintiffs retained Nancy Bond, a life care planner, and Dr. Robert Wassman as expert witnesses (Docs. 131-1; 131-2; 131-5; 131-6).

Subsequently, on August 29, 2022, Plaintiffs filed a motion to strike, seeking to exclude all or part of Dr. Cotter's testimony (Doc. 129). Generally, Plaintiffs' motion argues Dr. Cotter is not qualified to offer his opinions because he has insufficient education, experience, and training to offer opinions on the issue of informed consent as applied to pre-implantation testing (*Id.* at p. 7). Additionally, Plaintiffs argue that if Dr. Cotter is permitted to testify at all, he should be prevented from testifying regarding: (1) whether Dr. Cooper's discussions with Plaintiffs satisfied informed consent requirements; (2) what a reasonable couple would have done if they were in Plaintiffs' situation; and (3) the possibility that Plaintiffs independently conceived Hannah (*Id.* at pp. 9-11). Plaintiffs also filed a motion to strike specific portions of Dr. Sanfilippo's testimony (Doc. 130). Specifically, Plaintiffs seek to prevent Dr. Sanfilippo from testifying regarding: (1) the possibility that Plaintiffs independently conceived Hannah; and (2) whether Dr. Paul, Lindsey Cordes' OB/GYN, understood that the genetic testing was not perfectly accurate (*Id.* at pp. 4-6).

Defendants filed a joint *Daubert* motion on August 29, 2022, which seeks to exclude the testimony of Ms. Bond and Dr. Wassman (Doc. 131).[2] Defendants argue Ms. Bond's

---

[2] Advagenix also filed a motion for summary judgment on August 29, 2022 (Doc. 128). This motion will be addressed in a separate order.

testimony should be excluded because she is a life care planner and not a medical doctor (*Id.* at p. 4). Accordingly, Defendants contend that Ms. Bond is not qualified to render opinions regarding Hannah's future medical needs and any such opinions are speculative (*Id.*). Additionally, Defendants argue Dr. Wassman's testimony should be excluded because he is not qualified to provide opinions regarding informed consent and the specific pre-implantation genetic testing at issue in this case (*Id.* at pp. 7-9).

## EXPERT TESTIMONY STANDARD

The admission of expert testimony is governed by Federal Rule of Evidence 702 and the Supreme Court's opinion in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). *See Krik v. Exxon Mobil Corp.*, 870 F.3d 669, 673 (7th Cir. 2017); *Manpower, Inc. v. Ins. Co. of Pennsylvania*, 732 F.3d 796, 806 (7th Cir. 2013) (Explaining that although *Daubert* interpreted a prior version of Rule 702, "it remains the gold standard for evaluating the reliability of expert testimony and is essentially codified in the current version of Rule 702."); *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 778 (7th Cir. 2017) (stating that even when a federal court's jurisdiction rests on diversity, *Daubert* and Rule 702 govern the admissibility of expert witness testimony). Rule 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702. To put it another way, "*Daubert* [and Rule 702] requires the district court to act as an evidentiary gatekeeper, ensuring that an expert's testimony rests on a reliable foundation and is relevant to the task at hand." *Krik*, 870 F.3d at 674. Additionally, the principles set forth in *Daubert* apply equally to non-scientific fields. *Manpower*, 732. F.3d at 806; *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (holding that a district court's gatekeeping obligation applies to all expert testimony).

"Although this places the judge in the role of gatekeeper for expert testimony, the key to the gate is not the ultimate correctness of the expert's conclusions. Instead, it is the soundness and care with which the expert arrived at her opinion[.]" *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013). Consequently, the Court's inquiry most focus upon the principles and methodology employed by the expert. *Id.* "In other words, the district court must evaluate: (1) the proffered expert's *qualifications*; (2) the *reliability* of the expert's methodology; and (3) the *relevance* of the expert's testimony." *Gopalratnam*, 877 F.3d at 779 (emphasis in original). In conducting such an inquiry, district courts hold broad discretion in determining the relevance and reliability of expert opinion testimony. *Krik*, 870 F.3d at 674. However, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

Ultimately, "[t]he party seeking to introduce the expert witness testimony bears the burden of demonstrating that the expert witness testimony satisfies the standard by

a preponderance of the evidence." *Krik*, 870 F.3d at 673. Moreover, Federal Rule of Evidence 403 "overlays all other evidentiary rules by stating that a court may 'exclude relevant evidence if its probative value is substantially outweighed by the danger of ... unfair prejudice, confusing the issues, [or] misleading the jury.'" *Id.* at 674 (quoting FED. R. EVID. 403).

<u>DISCUSSION</u>

Three motions are presently before the Court: (1) Plaintiffs' motion to strike all or some of the opinions of Dr. Cotter (Doc. 129); (2) Plaintiffs' motion to strike certain opinions of Dr. Sanfilippo (Doc. 130); and (3) Defendants' joint *Daubert* motion to exclude the testimony of Ms. Bond and Dr. Wassman (Doc. 131). The Court addresses each of these motions in turn.

I.    <u>*Dr. Cotter's Expert Opinions (Doc. 129)*</u>

Plaintiffs argue Dr. Cotter is not qualified to offer expert opinions on the issues presented in this case (Doc. 129, p. 6). Specifically, Plaintiffs contend that Dr. Cotter lacks sufficient education, experience, and training to testify as to informed consent in pre-implantation genetic testing (*Id.*). Additionally, Plaintiffs maintain that even if Dr. Cotter is permitted to testify, he should not be permitted to express his opinions regarding: (1) Illinois law and whether Dr. Cooper's discussions with Plaintiffs satisfied informed consent requirements; (2) what a reasonable couple would have done if they were in Plaintiffs' situation; and (3) the possibility that Plaintiffs independently conceived Hannah (*Id.* at pp. 9-11).

Dr. Cotter is a laboratory director and consultant, and is board certified in laboratory genetics, cytogenetics, and molecular genetics (Doc. 129-2, pp. 1-3). Dr. Cotter obtained both a doctorate and master's degree in human genetics, along with a diploma of management, a diploma of medical laboratory technology, and a master's degree in plant breeding and cytogenetics (*Id.* at p. 1). In addition to currently being the laboratory director at Pacific Diagnostics Clinical Laboratory and co-lab director of the clinical lab at ResearchDx, Dr. Cotter has worked as a laboratory director at numerous other labs and worked as an associate professor for the Department of Pediatrics in the College of Medicine at the University of California San Francisco (*Id.* at pp. 1-2). Moreover, Dr. Cotter testified that he has worked in a consulting capacity with labs that perform pre-implantation genetic testing (Doc. 129-3, transcript p. 16).

In forming his opinions and preparing his report, Dr. Cotter reviewed an extensive number of documents including: Advagenix's records, the Vios Defendants' records, Mercy Hospital records, the reviewing physician reports, and the deposition testimony and exhibits of numerous parties (Doc. 129-1, p. 1). According to Dr. Cotter's report, several of his ultimate opinions are:

1) Advagenix followed the standard of care applicable to a laboratory performing genetic testing for patients that the lab did not have contact with.

2) The standard of care did not require Advagenix to obtain documentation demonstrating that Plaintiffs had informed consent discussions with Advagenix.

3) A reasonable couple that was fully informed of the testing's accuracy rate would have proceeded with the transfer of embryos.

4) It has not been ruled out that Hannah could have been born due to an independent conception.

Doc. 129-1.

The Court first considers whether Dr. Cotter is qualified to offer his opinions generally. And here, the Court finds Dr. Cotter is qualified to render opinions related to informed consent in pre-implantation genetic testing based on his overall experience and education.

Crucially, having worked as a laboratory director for numerous genetic testing laboratories, Dr. Cotter testified to having dealt with issues of informed consent (Doc. 129-3 at transcript pp. 6-7). Dr. Cotter discussed his experiences as a lab director and how issues of informed consent were typically handled (*Id.* at transcript pp. 24-26). He also explained that the requirements of informed consent may vary based upon the nature of the testing (*Id.*). Furthermore, Dr. Cotter even explained that laboratories are required to obtain informed consent when dealing with genetic testing originating in New York (*Id.* at transcript p. 27). Although New York law is obviously inapplicable to this case, Dr. Cotter's explanation and understanding of the variance in state law further demonstrates that he is qualified to offer opinions as to informed consent for genetic testing laboratories.

The Court is not persuaded by Plaintiffs' argument that Dr. Cotter's testimony should be prohibited because he has no direct experience dealing with informed consent issues in laboratories that handle this specific type of pre-implantation genetic testing (*see* Doc. 129, p. 7). Dr. Cotter is not testifying as to the subtle nuances between different types

of pre-implantation genetic testing. Rather, he is testifying regarding the issue of informed consent in pre-implantation genetic testing at a laboratory that has no direct contact with its patients, something that he is very familiar with as both a laboratory director and consultant. And notably, Plaintiffs do not explain why the informed consent process in this situation would be different than in the laboratory situations Dr. Cotter has experience in. *See Webster Bank, N.A. v. Pierce & Associates, P.C.*, 2020 WL 616467, at *3 (N.D. Ill. Feb. 10, 2020) (holding that although an expert did not have experience with the exact issue, he could testify as to the standard of care for a reasonable attorney because of his own experience and knowledge). Nevertheless, to the extent Plaintiffs believe this distinction to be significant, this issue can be explored on cross-examination as it may bear on the weight the jury gives to the evidence, but not its ultimate admissibility. *See Abrams v. FedEx Ground Package System, Inc.*, 585 F. Supp. 3d 1131, 1153 (S.D. Ill. 2022) (allowing an expert to testify as to safety management systems and finding the opposing party may vigorously cross-examine the expert as to the basis of his testimony and let the jury determine his credibility).

Additionally, although the majority of Plaintiffs' arguments to strike the entirety of Dr. Cotter's testimony focus upon challenging his qualifications, the Court has also analyzed the reliability of Dr. Cotter's methodology and the relevance of his testimony. *See Gopalratnam*, 877 F.3d at 779. Here, Dr. Cotter based his opinions upon a review of the aforementioned materials, his training, education, experience, and other relevant literature (Doc. 129-1, pp. 1-2). Dr. Cotter has sufficiently linked his overall conclusions to his review of the relevant materials and his years of experience in this field. *See, e.g.,*

*Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010) ("An expert's testimony is not unreliable simply because it is founded on his experience rather than on data[.]"); *Whole Woman's Health All. v. Rokita*, 2021 WL 650589, at *11 (S.D. Ind. Feb. 19, 2021) (expert testimony regarding informed consent via telemedicine included an adequate explanation of methodology based upon the expert's years of experience). Furthermore, the Court finds Dr. Cotter's opinions related to informed consent practices for laboratories such as Advagenix with no direct patient contact to be highly relevant to Plaintiffs' claims against Advagenix. Dr. Cotter's opinions will assist the jury in understanding the evidence and how genetic testing laboratories handle informed consent. *See Metavante*, 619 F.3d at 761 (expert testimony would assist the court in analyzing the reasonableness of one party's assessment of another party's performance in a particular industry during a transition to new technology).

However, the Court's inquiry does not end here. Plaintiffs also seek to prohibit Dr. Cotter from offering opinions on several specific topics.[3] For the reasons discussed below, the Court agrees that Dr. Cotter's opinions must be limited in certain aspects.

A. *Dr. Cotter's opinions regarding Illinois law and Dr. Cooper's discussions*

Plaintiffs move to strike a portion of Dr. Cotter's proffered testimony regarding informed consent (Doc. 129, pp. 9-10). Specifically, Plaintiffs seek to strike Dr. Cotter's testimony that Dr. Cooper's discussions with Plaintiffs satisfied informed consent

---

[3] Defendants contend that it is inappropriate for Plaintiffs to move to strike specific portions of proposed testimony. However, the Seventh Circuit has held that district courts may strike portions of testimony under Rule 702, explaining "that if the district court found a particular part of that testimony irrelevant or unreliable, it could exclude that portion of the testimony without striking the proposed evidence in its entirety." *Smith v. Ford Motor Co.*, 215 F.3d 713, 721 n.3 (7th Cir. 2000).

requirements (*Id.*). Plaintiffs also argue that Dr. Cotter's testimony regarding informed consent requirements is contradicted by Illinois law, demonstrating his unfamiliarity with informed consent (*Id.*).

After carefully considering the issue, the Court concludes that Dr. Cotter may offer his opinions about informed consent in genetic testing as related to the conversations that allegedly occurred between Dr. Cooper and Plaintiffs. As discussed above, Dr. Cotter is qualified as an expert to offer opinions regarding informed consent in situations involving genetic testing. Dr. Cotter's opinions are based upon his years of experience, are highly relevant to this case, and will assist the trier of fact in considering the sufficiency of Dr. Cooper's alleged informed consent conversations with patients. *See, e.g.*, *Rokita*, 2021 WL 650589, at *11 (a doctor's opinions on the appropriate use of informed consent in telemedicine were admissible because they reflected the doctor's years of experience and were sufficiently linked to his conclusions).

However, while Dr. Cotter may offer his opinions, he must do so without offering legal conclusions or improper hearsay. *See, e.g.*, *Specialty Earth Scis., LLC v. Carus Corp.*, 2021 WL 4804076, at *10 (N.D. Ill. Oct. 14, 2021) (expert opinion that relied upon legal conclusion was impermissible); *Matter of James Wilson Associates*, 965 F.2d 160, 173 (7th Cir. 1992) ("If for example the expert witness (call him A) bases his opinion in part on a fact (call it X) that the party's lawyer told him, the lawyer cannot in closing argument tell the jury, 'See, we proved X through our expert witness, A.'"). For example, Dr. Cotter

may testify, based upon his experiences, as to the standard of care[4] surrounding informed consent for genetic testing laboratories and to the frequency patients and laboratories directly communicate versus communicate through a treating physician based, but Dr. Cotter's testimony may not be used to establish that Plaintiffs did not know Advagenix was conducting their testing. *See also Sommerfield v. City of Chicago*, 254 F.R.D. 317, 324 (N.D. Ill. 2008) ("These cases teach that under Rule 703, an expert may rely on hearsay in formulating his opinion if it is of the type reasonably relied on by experts in the field, and that the evidence is not admissible for the truth of the matters asserted."); *Loeffel Steel Products, Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 808 (N.D. Ill. 2005).

Consequently, Plaintiffs' motion to strike this portion of Dr. Cotter's opinion is DENIED.

B. *Dr. Cotter's reasonable couple opinion*

Plaintiffs also move to strike Dr. Cotter's opinions regarding what a reasonable couple, having been fully informed, would do in Plaintiffs' situation (Doc. 129, p. 10). Perhaps in recognition of the improper nature of this proffered opinion, Advagenix has not provided a response to this point. Ultimately, the Court agrees with Plaintiffs and Dr.

---

[4] Plaintiffs argue Dr. Cotter is either unfamiliar with or misstates the standard of care in Illinois for informed consent in this type of situation (Docs. 129, pp. 9-10; Doc. 154, pp. 2-4). Plaintiffs cite to several Illinois cases that seemingly lay out the standard of care regarding informed consent (Doc. 154, pp. 3-4). *See Taylor v. County of Cook*, 957 N.E.2d 413, 433 (Ill. App. 1st Dist. 2011); *Coryell v. Smith*, 653 N.E.2d 1317, 1321 (Ill. App. 1st Dist. 1995); *Roberts v. Patel*, 620 F. Supp. 323, 325 (N.D. Ill. 1985). Having reviewed the caselaw cited by Plaintiffs, the Court is not currently convinced that the standard of care discussed in the above cases is necessary applicable to this specific type of action involving genetic testing at a laboratory with no direct patient contact. However, Plaintiffs may address this issue on cross examination and challenge Dr. Cotter's understanding of the applicable standard of care. *See Antioch Co. Litig. Tr. v. McDermott Will & Emery, LLP*, No. 3:09-CV-218, 2016 WL 4480650, at *4 (S.D. Ohio Aug. 25, 2016).

Cotter will be prohibited from offering his opinion as to what a fully informed, reasonable couple would do in Plaintiffs' situation.

Expert opinions are inadmissible when they convey legal conclusions rather than expert opinions. *See RLJCS Enterprises, Inc. v. Prof. Ben. Tr. Multiple Employer Welfare Ben. Plan and Tr.*, 487 F.3d 494, 498 (7th Cir. 2007); *Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003) ("[E]xpert testimony as to legal conclusions that will determine the outcome of the case is inadmissible."). Under Illinois law:

> To succeed in a malpractice action based on the doctrine of informed consent the plaintiff must plead and ultimately prove four essential elements: (1) the physician had a duty to disclose material risks; (2) he failed to disclose or inadequately disclosed those risks; (3) as a direct and proximate result of the failure to disclose, the patient consented to treatment she otherwise would not have consented to; and (4) plaintiff was injured by the proposed treatment.

*Coryell v. Smith*, 653 N.E.2d 1317, 1319 (Ill. App. 1st Dist. 1995). Critically, when analyzing the third factor, the key question is, "[w]ould a reasonably prudent person in the plaintiff's position, after being properly informed, have nonetheless proceeded with the proposed treatment?" *Id.* at 1320.

Accordingly, Dr. Cotter's testimony as to what a reasonable couple would do in Plaintiffs' situation is an outcome determinative legal conclusion that must be prohibited. *See, e.g.*, *Webster Bank, N.A.*, 2020 WL 616467, at *5 (prohibiting an expert witness from testifying that the defendant's actions were an egregious violation of the standard of care because that issue is for the jury to determine). "[N]o one is in a better position than the jury to determine whether any alleged undisclosed information would have altered the plaintiff's decision to undergo the proposed treatment had it been disclosed." *Coryell*, 653

N.E.2d at 1321. Plaintiffs' motion to strike Dr. Cotter's reasonable couple testimony is GRANTED. *See generally Halcomb v. Washington Metro. Area Transit Auth.*, 526 F. Supp. 2d 24, 27 (D.D.C. 2007) ("Expert testimony consisting of legal conclusions is impermissible because such testimony merely states what result should be reached, thereby improperly influencing the decisions of the trier of fact and impinging upon the responsibilities of the court.").

C. *Expert opinion as to the potential of an independent conception*

Plaintiffs assert that the Court should prohibit Dr. Cotter's opinions regarding the potential that Hannah was conceived through an independent conception (Doc. 129, p. 11). Specifically, Dr. Cotter's report indicates that Plaintiffs and their experts have not accounted for the possibility that Hannah was conceived as the result of an independent conception, *i.e.*, that Plaintiffs engaged in sexual relations that naturally resulted in pregnancy at or around the same time period as when the two embryos were implanted (Doc. 129-1, p. 5). Plaintiffs respond that such an opinion is unsupported from the record, highly speculative, and could unnecessarily confuse the jury (*Id.*). Advagenix disputes Plaintiffs' contentions and argues it should be permitted to offer alternative causes for the injury because there is some evidence in the record of another sole proximate cause (Doc. 148, p. 14).

Under Illinois law, a defendant is permitted to raise this type of challenge when there is some competent evidence of another sole proximate cause. *See, e.g., Leonardi v. Loyola U. of Chicago*, 658 N.E.2d 450, 459 (Ill. 1995) (allowing a jury instruction to include language regarding sole proximate cause because there was some evidence in the record

to justify the instruction); *McDonnell v. McPartlin*, 736 N.E.2d 1074, 1084 (Ill. 2000) (jury should be instructed on sole proximate cause "assuming some competent evidence" is presented). However, there needs to be some "competent evidence" tending to establish an alternative cause of Plaintiffs' injuries. *Id.; see also Teran v. Coloplast Corp.*, 633 F. Supp. 3d 1103, 1118 (N.D. Ill. 2022); *Lauzon v. Senco Products, Inc.*, 270 F.3d 681, 695 (8th Cir. 2001) ("We would agree that where opinion testimony has no support in the record that it should be excluded."); *Constructora Mi Casita, S de R.L. de C.V. v. NIBCO, Inc.*, 448 F. Supp. 3d 965, 972 (N.D. Ind. 2020) ("An opinion witness can make assumptions, but those assumptions need some grounding in the record or his expertise."). "Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Defendants[5] have only pointed to two records to justify their independent conception theory: an answer John Cordes gave during his deposition (Doc. 147-1 at transcript pp. 20-21) and an email from Lindsey Cordes to a nurse inquiring as to whether

---

[5] The Court will also briefly discuss this point in a later section of this Order that addresses Plaintiffs' challenges to Dr. Sanfilippo. However, for brevity's sake, the Court will introduce the key arguments made in both motions (Docs. 129, 130) in this section because the underlying legal challenge is the same regardless of which expert opinion is considered.

Plaintiffs could have sex (Doc. 147-3; *see also* Doc. 147, p. 2; Doc. 148, pp. 14-15).[6]

Specifically, during John Cordes' deposition, he was asked the following:

> Q.   All right. And let me ask you, did you and your wife have sex in the months of April or May of 2017?
> A.   I don't believe so.
> Q.   Okay. You saw that your wife had actually sent an e-mail on April 13th asking if you could. Do you recall you and your wife talking about, you know, can you find out, can we or not, is it safe to or not?
> A.   Yes, I believe we did talk about it, yes.
> Q.   And so once you learned that it could -- that you could, as long as you used a condom, did you have sex using a condom?
> A.   No.

Doc. 147-1 at transcript pp. 20-21. Additionally, as noted in John Cordes' deposition, Lindsey Cordes emailed a nurse at the Center for Reproductive Medicine and Wellness on April 13, 2017, to inquire as to whether Plaintiffs could have sex (Doc. 147-3). The nurse answered that they could but advised them to use a condom (*Id.*).

Having meticulously reviewed both records along with the numerous other records in this case, the Court is not persuaded that either record could be considered evidence of sexual relations between John and Lindsey Cordes during the time period in question. Emailing to inquire about whether having sexual intercourse would be permissible is not, without more, evidence that sexual intercourse occurred. Moreover,

---

[6] In fact, Advagenix's response on this point merely states that "Dr. Cotter's testimony regarding the possibility that the Cordeses became pregnant naturally … satisfies the minimum requirements that there be 'some evidence' of an alternate cause for the plaintiffs' claimed injuries." (Doc. 148, pp. 14-15). However, at no point in their response does Advagenix cite to any factual evidence in support of an independent conception (*See* Doc. 148). Indeed, only the Vios Defendants' response even mentions the email or John Cordes' deposition testimony (*See* Doc. 147). Advagenix seems to be suggesting that Dr. Cotter's testimony on this subject (which is without factual support) can be considered some competent evidence to get in an alternative cause theory. But Advagenix offers no authority to support this proposition. Instead, Advagenix takes the inherently contradictory position that there is a "lack of evidence" on this subject, but nevertheless, Dr. Cotter's opinion should be permitted.

the Court does not reasonably interpret John Cordes' answer, which ultimately ended with a simple and firm "no," as providing any evidence to support Defendants' experts' theories.

In fact, it appears both Dr. Cotter and Dr. Sanfilippo agree that their theories as to an independent conception are speculative at best (Doc. 129-3 at transcript p. 94; Doc. 130-3 at transcript p. 39). When Dr. Cotter was questioned about whether there was any evidence in the record demonstrating that Plaintiffs had sex during the relevant time period, with or without a condom, Dr. Cotter agreed that Plaintiffs both stated they did not (Doc. 129-3 at transcript pp. 92-93). Similarly, during Dr. Sanfilippo's deposition, the following exchange occurred with Plaintiffs' counsel:

> Q.   Do you have any evidence, whether it be through anything that Hannah was diagnosed with or any of the depositions, that, in fact, the Cordeses did spontaneously have unprotected intercourse at or around the time that Hannah was conceived?
>
> A.   I have no clear evidence. Hannah (sic) did inquire about it. She was told you can have intercourse with condoms. In the deposition of John Cordes, when he was asked, he said, "I don't think so," in terms of: Did you have intercourse?
>
> Q.   Anything other than that that you can point to that would indicate that they had unprotected intercourse at or near the time of Hannah's conception?
>
> A.   No.

Doc. 130-3 at transcript p. 40. Dr. Sanfilippo also described the possibility of an independent conception as a "remote possibility," which more likely than not was not the cause of Hannah being born with the genetic abnormalities (*Id.* at transcript p. 39). Similarly, when questioned, Dr. Cotter admitted he did not have an opinion to a

reasonable degree of medical certainty as to the possibility of an independent conception (Doc. 129-3 at transcript p. 94).

In sum, Defendants have failed to cite to any records that provide actual support for their theory of an independent conception during the time period in question. Moreover, when questioned, both of Defendants' experts could not provide opinions to a reasonable degree of medical certainty on this topic. Accordingly, these opinions, that have no factual predicate and are not made to any reasonable degree of medical or scientific certainty must be excluded. *See Vandervelden v. Saint Louis Univ.*, 589 F. Supp. 3d 944, 951 (S.D. Ill. 2022) ("Because Dr. Murphy admitted in her deposition that she could not make this statement to a reasonable degree of medical certainty, the Court agrees this opinion should be excluded."). Consequently, the Court GRANTS Plaintiffs' motion to strike Dr. Cotter's and Dr. Sanfilippo's opinions as to the possibility of an independent conception.

Moreover, Dr. Cotter's and Dr. Sanfilippo's independent conception theories may be excluded for another reason entirely. Specifically, expert testimony that is otherwise admissible under Rule 702 may nonetheless be excluded under Rule 403 if its probative value is outweighed by the danger of unfair prejudice or confusion of the issues. *Buscaglia v. U.S.*, 25 F.3d 530, 533 (7th Cir. 1994). Here, given Dr. Cotter's admission that he had no evidence whatsoever to the contrary, Dr. Cotter's expert testimony regarding the possibility of an independent conception would unfairly prejudice Plaintiffs and risk confusing the jury. Similarly, Dr. Sanfilippo's opinions and proffered discussion regarding the length of time a sperm can survive in the reproductive tract would be

unduly prejudicial and unnecessarily confusing given the absence of evidentiary support for his theory. *See United States v. Curry*, 977 F.2d 1042, 1050 (7th Cir. 1992) ("However, 'a district judge has broad discretion to exclude relevant evidence that is confusing or redundant' under Federal Rule of Evidence 403.") (quoting *Krist v. Eli Lilly and Co.*, 897 F.2d 293, 298 (7th Cir.1990)). Given the record currently before the Court, the probative value of the independent conception theories is substantially outweighed by the danger of unfair prejudice and confusion of the issues and it is excluded for this reason as well.

## II.     *Dr. Sanfilippo's Expert Opinions (Doc. 130)*

Plaintiffs also seek to strike certain portions of Dr. Sanfilippo's testimony (Doc. 130). Specifically, Plaintiffs seek to strike Dr. Sanfilippo's testimony that: (1) Plaintiffs may have conceived Hannah through an independent conception based upon the survival interval for sperm; and (2) Dr. Paul's records indicate Dr. Paul believed the genetic testing was not perfectly accurate (*Id.* at pp. 4-6).

Dr. Sanfilippo is a tenured professor in the Department of Obstetrics, Gynecology, and Reproductive Sciences at the University of Pittsburg (Doc. 130-2, p. 2; Doc. 130-3 at transcript p. 17). Dr. Sanfilippo also has extensive qualifications and education pertinent to reproductive medicine and science (*see generally* Docs. 130-1; 130-2; 130-3).[7] As related to this Order, Dr. Sanfilippo's opinion include:

1)  Hannah could have been independently conceived, based upon the length of time sperm can survive in the reproductive tract/cervical canal (Doc. 130-1, p. 3).

---

[7] Plaintiffs do not challenge Dr. Sanfilippo's general qualifications, methodology, or testimony as a whole. As a result, the Court has not provided a detailed explanation of all of Dr. Sanfilippo's extensive qualifications and his methodology.

2) Dr. Paul, Lindsey Cordes' OB/GYN, knew that pre-implantation genetic testing was not 100% accurate (Doc. 130-3 at transcript pp. 63-64 & 68-69).

For the reasons discussed above, the Court GRANTS Plaintiffs' motion to strike Dr. Sanfilippo's expert testimony related to the possibility of an independent conception (Doc. 130, pp. 4-5). Again, without any evidentiary support, the Court finds this opinion must be stricken for all of the reasons outlined above.

Regarding Plaintiffs' motion to strike Dr. Sanfilippo's opinions as to Dr. Paul's beliefs (Doc. 130, pp. 5-6), the Court does not believe there is an actual dispute anymore. The Vios Defendants have agreed that Dr. Sanfilippo "will not comment on what Dr. Paul knew or should have known." (Doc. 147, p. 2). Accordingly, this request is DENIED as MOOT. Should an issue with this testimony resurface, Plaintiffs may move to exclude the testimony through a motion *in limine*.

III. *Ms. Bond's Expert Opinions (Doc. 131)*

Defendants argue Ms. Bond's testimony should be excluded because she is not qualified to render opinions regarding Hannah's future medical expenses (Doc. 131, p. 4). Defendants further contend that Ms. Bond's opinions as to Hannah's future medical expenses are speculative because they are not supported by competent medical evidence (*Id.*). In response, Plaintiffs contend that Ms. Bond's opinions should be permitted because she is qualified as a life care planner and has applied a reliable methodology in formulating her opinions (Doc. 149, pp. 3-10).

Ms. Bond is a certified life care planner with bachelors' degrees in sociology and special education, and a master's degree in early childhood special education (Doc. 131-

1, pp. 27-28). Ms. Bond works at the Coordinating Center for Home and Community Care, Inc., where she develops multidisciplinary life care plans for children and adults with catastrophic health care issues (*Id.*). In her role as a life care planner, Ms. Bond has provided reports and expert witness testimony in hundreds of cases (*Id.* at pp. 31-70).

In forming her opinions and preparing a life care plan for Hannah, Ms. Bond reviewed Hannah's medical records, interviewed Plaintiffs, interviewed Hannah's primary care physician, Dr. Etihad Shakir Al-Falahi, and reviewed the deposition testimony of both Hannah's treating pediatric neurologist, Dr. Sarah Bauer-Huang, and Hannah's treating pediatric neurologist, Dr. Lawrence Tychsen (*Id.* at p. 2). Ms. Bond has further stated that Hannah's life care plan was developed consistent with her regular practices and standards of practice in the field of life care planning (*Id.* at p. 1).

Defendants take issue with Ms. Bond's life care plan insofar as it offers medical opinions regarding the future therapy and treatment Hannah will require (Doc. 131, p. 2). Defendants point out that several of Hannah's doctors testified that they could do no more than speculate as to Hannah's future medical needs (*Id.* at p. 5; Doc. 131-3, p. 54; Doc. 131-4 at transcript pp. 52-53). For instance, in Dr. Bauer-Huang's deposition, the following exchange occurred:

> Q.   Are you able to say without speculating, so with some degree of medical certainty, whether Hannah will – or what her long-term caregiver needs would be?
> A.   I don't know how to – I don't know how to answer that without speculating.
> Q.   Okay. Good, and I don't want you to speculate. So that's fine. And similarly, is it – would it be just pure speculation to know what her long-term mobility deficits may or may not be?

A.      So, what I would like to represent is that she is still developing and that our understanding of her abilities in the future are changing as we see what she is able to do. And as Jen had said, our goals with therapy are to help her optimize and achieve the most ability that she is able to achieve. So, there is no literature or data for Hannah. She is incredibly unique. So, there is no data that I can use to guide me on her outcomes in terms of mobility, like there may be for other medical diagnoses.

…

Q.      Yes. So, and I just want to make clear that you can only speculate now and we don't want speculation, because this is an ongoing evolving process, correct?

A.      Correct, but based on where she is now compared to other children her age, she is obviously requiring support and she is obviously requiring equipment.

Doc. 131-3, pp. 54-56.

Nevertheless, Ms. Bond's testimony is admissible because Ms. Bond has applied her training and experience using a reliable methodology to formulate a life care plan. Critically, Ms. Bond did not formulate Hannah's life care plan based on her own assessment of Hannah's medical conditions. Instead, Ms. Bond reviewed countless records, spoke with Hannah's medical providers and Plaintiffs, and applied a reliable methodology. She interviewed Plaintiffs and Hannah's pediatrician and read numerous depositions to gain an understanding of Hannah's current and ongoing needs (*see* Doc. 131-1, pp. 7-11). She then assessed Hannah's education and rehabilitation efforts (*Id.* at pp. 11-13). Ms. Bond's life care plan continued by reciting Hannah's daily care needs as conveyed to her by Plaintiffs (*Id.* at pp. 13-14). Next, Ms. Bond analyzed both Hannah's equipment needs and her housing and transportation needs, based upon statements from Hannah's physicians and Plaintiffs (*Id.* at pp. 14-15). Finally, only after explaining this

critical background of Hannah's needs, did Ms. Bond provide estimates as to Hannah's future medical expenses (*Id.* at pp. 18-23).

In light of Ms. Bond's meticulous methodology, the Court is not persuaded by Defendants' arguments that Ms. Bond's testimony is unsupported and speculative. Ms. Bond's career as a life care planner is centered around forecasting future expenses based upon current medical expenses and needs. Admittedly, Ms. Bond was willing to make detailed future predictions in areas where Hannah's medical professionals were not. However, that is not to say that Ms. Bond's life care plan did not rely upon or contradicted the statements of medical professionals. Instead, it appears Ms. Bond extrapolated upon Hannah's physicians' understanding that future care would be required. For example, while Dr. Bauer-Huang would not speculate as to Hannah's specific future outcomes, Dr. Bauer-Huang's deposition testimony cited to by Defendants still makes clear that Hannah would require substantial future care in the areas Ms. Bond expanded upon (*see generally* Doc. 131-3). Given Ms. Bond's experience and reliable methodology in preparing her report and developing her opinions, this is permissible. *See Schultz*, 721 F.3d at 431 (the soundness and care with which an expert arrived at her opinions is the key consideration in the admissibility of expert testimony); *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000) ("The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact[.]").1 BRUCE STERN & JEFFREY BROWN, LITIGATING BRAIN INJURIES § 6:13 (perm. ed., rev. vol. 2022) (Life care planners should not be reduced to

"clerical staff member whose only responsibility is to quantify the costs of future medical care prescribed or recommended by a physician.").

Moreover, numerous other courts have allowed expert testimony from life care planners in similar circumstances. For instance, in *Marcano Rivera v. Turabo Med. Ctr. Partn.*, the plaintiffs utilized a life care planner to offer expert testimony regarding the projected cost of future care. 415 F.3d 162, 170 (1st Cir. 2005). The defendants sought to preclude such testimony by arguing that the life care planner's methodology was unreliable. *Id.* However, the district court admitted the life care planner's testimony based upon his professional credentials, review of the records, and admission as an expert in other cases. *Id.* at 171. In reviewing the district court's decision to permit the life care planner's testimony, the First Circuit stated, "Although [the life care planner's] report might have benefitted from a physician's review of the projections regarding Fabiola's future needs, the court did not abuse its discretion in determining that [the life care planner's] methodology was sufficiently reliable for admissibility." *Id. See also Paine ex rel. Eilman v. Johnson*, No. 06 C 3173, 2010 WL 749861, at *3 (N.D. Ill. Feb. 25, 2010) (allowing expert testimony as to what future medical care may involve because the expert's opinions were reliable and relevant, even when the expert did not have "separate expertise in the medical fields at issue); *Taylor v. Union Pac. R.R. Co.*, Civil No. 09-123-GPM, 2010 WL 3724287, at *3 (S.D. Ill. Sept. 16, 2010) (denying motion to exclude evidence of certain specific costs contained in a life care plan in part because those "are all matters that should be and doubtless will be aired before the jury on cross-examination."); *Kent Village Associates Jt. Venture v. Smith*, 657 A.2d 330, 338 (Md. Spec. App. 1995) (rejecting

the appellant's argument that a life care planner's testimony should have been excluded because "there was no medical evidence from qualified medical experts sufficient to support it.").

Consequently, Defendants' motion to exclude Ms. Bond's testimony is DENIED. Any challenges or issues Defendants have with respect to Ms. Bond's life care plan can be adequately addressed on cross-examination. *See North v. Ford Motor Co.*, 505 F. Supp. 2d 1113, 1120 (D. Utah 2007) (permitting life care planner testimony and explaining that to the extent the movant believed the life care planner did not have all necessary information, "those issues are a matter of credibility and weight to be brought out in cross-examination and resolved by the jury.").

IV.     *Dr. Wassman's Expert Opinions (Doc. 131)*

Defendants argue Dr. Wassman is not qualified to offer testimony related to the pre-implantation genetic testing and accompanying informed consent issues presented in this case (Doc. 131, pp. 7-9). In support of their argument, Defendants point out that Dr. Wassman works as a legal consultant, has "never done next generation sequencing on a trophectoderm biopsy of embryos," and does not provide informed consent to patients regarding pre-implantation genetic testing (*Id.* at p. 8).

Dr. Wassman is the Principal/CEO/CMO of Life Designs Ventures, an independent consulting company in personalized medicine, genetic diagnostics, laboratory medicine, and biotechnology (Doc. 131-5, p. 7). He is board certified in pediatrics, medical genetics, and cytogenetics (*Id.* at p. 9). Dr. Wassman obtained an M.D. from Albany Medical College, a bachelor's degree in biology from Yale University, and

completed a pediatric internship and residency (*Id.* at p. 6). In addition to running his consulting company, Dr. Wassman acts as a laboratory director for Progenitor MDX and serves as an advisor for Phase Genomics, an organization that utilizes advanced novel next-generation sequencing technology to better detect structural rearrangements in chromosomes (*Id.* at p. 7; Doc. 131-6 at transcript pp. 30-31).

In forming his opinions and preparing his report, Dr. Wassman reviewed an extensive number of documents including: the medical records of John, Lindsey, and Hannah Cordes, discovery documents provided by Defendants, literature discussing practice standards in reproductive technologies, and the deposition testimony and exhibits of numerous individuals (Doc. 131-5, pp. 1-3). According to Dr. Wassman's report, several of his ultimate opinions are:

1) Advagenix failed to follow the applicable standard of care by not possessing documentation demonstrating adequate informed consent occurred prior to releasing Plaintiffs' test results.

2) The two informed consent documents Dr. Cooper claims Vios used in 2017 would have been inadequate to document written informed consent, even if transmitted to Advagenix.

3) The deviations from the standard of care resulted in lack of notice, lack of choice, and the inability to provide informed consent so Plaintiffs could understand and analyze the risks involved.

Doc. 131-5.

The Court finds Dr. Wassman is qualified to offer his opinions based upon his training, education, and experiences. Defendants primarily challenge Dr. Wassman's qualifications based upon his lack of recent work experience with the specific pre-implantation genetic testing and informed consent conversations involved in this case. However, Dr. Wassman currently serves as an advisor for Phase Genomics, which uses the same platform technology and methodology as was used in this case (Doc. 131-6 at transcript p. 31). Additionally, Dr. Wassman testified that some years ago, one of his laboratories helped pioneer pre-implantation genetic testing using fish (*Id.* at transcript p. 25). Furthermore, when questioned about his understanding of the technology Advagenix utilizes, Dr. Wassman stated that the "methodology they're using is the next-generation sequencing on the Thermo Fisher Platform. And they previously used prior generations, including the fish technology that I mentioned earlier that I had done when I was with Genzyme and with Alfigen. And they also use microarray technology which we used at Lineagen[.]" (*Id.* at transcript p. 31). The Court finds these experiences, along with his education and training, more than qualify Dr. Wassman in this field.

The Court is likewise unpersuaded by Defendants contentions that Dr. Wassman is not qualified to offer opinions as to informed consent in this field. Dr. Wassman testified to having experience providing informed consent to patients involved in pre-implantation genetic testing based upon his prior work at Genzyme Genetics and Alfigen Inc. (*Id.* at transcript pp. 32-33; Doc. 131-5, p. 8). Likewise, Dr. Wassman has testified to having continued involvement in informed consent conversations, just not currently in the areas of prenatal or pre-implantation testing (Doc. 131-6 at transcript p. 38). While

Defendants take issue with the fact that Dr. Wassman's experiences in informed consent do not recently involve pre-implantation genetic testing, his continued involvement in both informed consent conversations and work related to genetic testing demonstrate ample qualifications within which his opinions are grounded. If Defendants believe these distinctions and the passage of time undermine Dr. Wassman's credibility, then they can certainly explore that with Dr. Wassman on cross-examination. *See Abrams*, 585 F. Supp. 3d at 1153 (S.D. Ill. 2022).

Furthermore, the Court finds Dr. Wassman's methodology to be reliable and his testimony to be relevant. *See Gopalratnam*, 877 F.3d at 779. Dr. Wassman reviewed this case's numerous materials and relevant literature in order to reach his conclusions, which were based upon his experience and education. Dr. Wassman's expert opinions are relevant to Plaintiffs' claims against Defendants and will assist the trier of fact in understanding the issues raised in this case. *See Daubert*, 509 U.S. at 592.[8]

## CONCLUSION

Plaintiffs' motion to strike opinions of Dr. Cotter (Doc. 129) is **GRANTED in part and DENIED in part**. Specifically, Plaintiffs' motion to strike all of Dr. Cotter's opinions (Doc. 129, pp. 6-9) is **DENIED**; Plaintiffs' motion to strike Dr. Cotter's opinions related to the standard of care (Doc. 129, pp. 9-10) is **DENIED**; and Plaintiffs' motion to strike Dr. Cotter's opinions related to a reasonable couple (Doc. 129, pp. 10-11) is **GRANTED**. Additionally, Plaintiffs' motion to strike Dr. Cotter's (Doc. 129, p. 11) and Dr. Sanfilippo's

---

[8] The Court recognizes that these motions have been pending for some time and the parties have patiently waited on the Court for a resolution (*See* Docs. 129-131). While the Court has not sat idle during that time, the Court will not offer excuses. The Court apologizes to the parties for its delay in resolving these motions.

opinions (Doc. 130, pp. 4-5) related to the theory of an independent conception are **GRANTED**. Plaintiffs' motion to strike the remainder of Dr. Sanfilippo's testimony (Doc. 130, pp. 5-6) is **DENIED as MOOT**. Finally, Defendants' joint motion to exclude the testimony of Ms. Bond and Dr. Wassman (Doc. 131) is **DENIED**.

　　　　**IT IS SO ORDERED.**

　　　　**DATED:  September 29, 2023**

　　　　　　　　　　　　　　　　　　　　s/ Mark A. Beatty

　　　　　　　　　　　　　　　　　　　　**MARK A. BEATTY**
　　　　　　　　　　　　　　　　　　　　**United States Magistrate Judge**