IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JOHN CORDES and LINDSEY CORDES, | ) ) ) |
| Plaintiffs, | ) ) ) Case No. 3:20-CV-10-MAB |
| vs. | ) ) |
| CENTERS FOR REPRODUCTIVE MEDICINE AND WELLENSS, LLC, D/B/A VIOS FERTILITY, VIOS FERTILITY INSTITUTE CHICAGO, LLC, and ADVAGENIX, LLC, | ) ) ) ) ) |
| Defendants. | |

## MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

This matter is before the Court on Defendant Advagenix's motion for summary judgment (Doc. 128). For the reasons set for below, Advagenix's motion for summary judgment (Doc. 128) is DENIED.

### BACKGROUND

In 2016, Plaintiff Lindsey Cordes suffered a miscarriage (Doc. 44, p. 7). A chromosome analysis performed on tissue from the fetus revealed an abnormal chromosome pattern (*Id.*). After further testing, Plaintiff John Cordes was diagnosed with a genetic defect, known as a four-way translocation, which created a high likelihood that his sperm cells would contain an unbalanced amount of chromosome material (*Id.*). It is believed that John Cordes' four-way translocation was the cause of the miscarriage (*Id.*).

In February 2017, Plaintiffs John and Lindsey Cordes (collectively, "Plaintiffs") pursued fertility treatment with Dr. Amber Cooper[1] at the Center for Reproductive Medicine and Wellness LLC, d/b/a, Vios Fertility, and Vios Fertility Institute Chicago, LLC (collectively, the "Vios Defendants") in St. Clair County, Illinois (*Id.* at pp. 1-2). At an in-person consultation in Illinois, Dr. Cooper and Plaintiffs discussed the miscarriage, John Cordes' genetic defect, and the possibility of using an in vitro fertilization process and pre-implantation genetic screening to determine if an embryo had extra or missing chromosome material (*Id.* at p. 8). While the parties dispute the extent to which Dr. Cooper conveyed the potential for inaccurate testing results including false negatives to Plaintiffs, Defendants have not been able to provide documentation or proof of written informed consent (Doc. 128, p. 6; Doc. 150, p. 3).

Shortly after the consultation with Dr. Cooper, Plaintiffs began the in vitro fertilization process (Doc. 44 at p. 8). After thirteen of Plaintiffs' embryos were fertilized, six embryos were biopsied and sent to Defendant Advagenix for genetic screening (*Id.*). Plaintiffs did not have any direct conversations with Advagenix and Advagenix neither directly obtained informed consent from Plaintiffs nor confirmed that Dr. Cooper obtained informed consent from Plaintiffs before conducting the testing (Doc. 128, p. 8; Doc. 150, p. 3). After receiving and testing the embryos at its Maryland laboratory, Advagenix determined two embryos did not appear to have any genetic abnormalities (Doc. 44, p. 8; Doc. 53, p. 11; Doc. 128, p. 6). Likewise, Advagenix did not confirm that

---

[1] Dr. Cooper was previously named as a defendant in this action (*see* Doc. 1). Plaintiffs voluntarily dismissed Dr. Cooper without prejudice in April 2020 (Doc. 41).

informed consent had occurred prior to releasing the test results to the Vios Defendants and Plaintiffs (Doc. 128, p. 8). On May 15, 2017, Dr. Cooper implanted Lindsey Cordes with both "normal" embryos (Doc. 128, pp. 6-7). An ultrasound later revealed one of the embryos survived (Doc. 44 at p. 9). Thereafter, Lindsey Cordes gave birth to Hannah Cordes on January 19, 2018 (*Id.*). Hannah was born with numerous physical anomalies and subsequent testing revealed a genomic imbalance that was presumably a result of John Cordes' four-way translocation (*Id.* at pp. 9-10).

Plaintiffs filed this action on January 3, 2020, alleging Defendants committed medical malpractice by breaching the duty to provide care and treatment to Plaintiffs in accordance with that of a reasonably competent medical provider through their negligent acts and omissions (Doc. 1). Specifically, as stated in their second amended complaint, Plaintiffs claim they "underwent the preimplantation genetic counseling for the primary purpose of avoiding a child with an unbalanced translocation." (Doc. 44 at p. 10). Plaintiffs assert that Defendants failed to adequately apprise them of the inaccuracy of testing and the potential risk that the allegedly "normal" embryos would possess the genetic deficiencies Plaintiffs sought to avoid (*Id.* at pp. 10-11). As it relates to Advagenix, Plaintiffs brought one claim of medical malpractice (*Id.* at pp. 16-18). Plaintiffs alleged Advagenix had a duty to provide them with care and treatment in accordance with that of a reasonably competent medical provider (*Id.* at pp. 16-17). Plaintiffs stated Advagenix breached that duty in one of the following ways:

a) Defendants failed to properly perform the genetic testing at issue;
b) Defendants failed to properly counsel Plaintiffs regarding the accuracy of the genetic testing;

c) Defendants failed to properly counsel Plaintiffs regarding the risks of the genetic testing;
d) Defendants failed to appreciate the risks associated with the genetic testing at issue;
e) Defendants failed to adequately inform and/or counsel Plaintiffs regarding the risk for false positives or other incorrect results associated with the genetic testing at issue;
f) Defendants carelessly induced Plaintiffs to implant an embryo containing the unbalanced translocation;
g) Defendants negligently failed to identify the presence of an unbalanced translocation in Plaintiffs' embryos;
h) Defendants carelessly mischaracterized the embryos at issue as "normal";
i) Defendants failed to properly communicate the chances for false positives and/or possibility of inaccurate test results;
j) Defendants failed to appropriately identify the chances that the embryos labeled as "normal" had an unbalanced translocation;
k) Defendants failed to properly treat Plaintiffs; and
l) Such further breaches of the standard of care as discovery and the evidence reveal.

(Doc. 44, p. 17).

During the course of discovery, the parties disclosed their experts and corresponding expert reports to one another (Doc. 128, p. 7). Plaintiffs retained Nancy Bond, Dr. Kristin Herman, and Dr. Robert Wassman as expert witnesses (*Id.*). Meanwhile, Advagenix retained Dr. Phillip Cotter as an expert witness (*Id.* at p. 8). Of particular note to this Order, Dr. Cotter opined that: (1) Advagenix's actions were in conformance with the applicable standard of care for a laboratory performing genetic testing for patients the laboratory did not have direct contact with; and (2) that a reasonable couple in Plaintiffs' position, having been adequately informed, most likely would have proceeded with the transfer of embryos (*Id.* at pp. 8-9; Doc. 128-14 at transcript pp. 65 & 83-84).

Defendant Advagenix filed the instant motion for summary judgment on August 29, 2022 (Doc. 128). Plaintiff filed a response in opposition to summary judgment on September 1, 2023 (Doc. 150). Advagenix filed a reply brief in support of its motion for summary judgment on September 22, 2023 (Doc. 153).

## SUMMARY JUDGMENT STANDARD

 "Summary judgment is appropriate 'if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to summary judgment as a matter of law.'" *Spivey v. Adaptive Mktg. LLC*, 622 F.3d 816, 822 (7th Cir. 2010) (quoting Fed. R. Civ. P. 56(c)). A non-movant receives the benefit of conflicting evidence and reasonable inferences but he or she is still required to produce evidence sufficient to establish the essential elements of his or her claims. *Jackson v. Sheriff of Winnebago County, Illinois*, 74 F.4th 496, 500 (7th Cir. 2023). "Even when a motion for summary judgment is unopposed and the facts are undisputed, the moving party must still show that he is entitled to judgment as a matter of law. In other words, the moving party has no right to a legally incorrect ruling." *Strong v. Wisconsin*, 544 F. Supp. 2d 748, 759-60 (W.D. Wis. 2008) (internal quotation marks and citations omitted).

## DISCUSSION

Advagenix argues it is entitled to summary judgment for three reasons (Doc. 128, p. 2). First, Advagenix claims it is entitled to summary judgment because the relationship between Plaintiffs and Advagenix did not create a duty for Advagenix to "become involved in the informed consent process between plaintiffs and their physician to ensure

the physician provided appropriate consent[.]" (*Id.*). Second, Advagenix claims it is entitled to summary judgment because Plaintiffs failed to put forth any evidence demonstrating that a reasonable couple in their position would not have implanted the embryos had they been properly informed (*Id.*). Third, Advagenix argues Plaintiffs have presented no evidence demonstrating that its alleged failure to ensure Plaintiffs' physician obtained informed consent proximately caused their alleged injuries (*Id.*). In response, Plaintiffs argue Advagenix owed them a duty based upon their relationship and the medical services Advagenix provided (Doc. 150, pp. 6-14). Plaintiffs also assert that they provided sufficient evidence from which a jury could rule in their favor on each element of their claim against Advagenix (*Id.* at pp. 14-19).

    I.    <u>*Advagenix's Duty Regarding Informed Consent*</u>

Plaintiffs' claim against Advagenix argues, in part, that Advagenix committed medical malpractice by failing to obtain informed consent (Doc. 44, p. 17). In its motion for summary judgment, Advagenix counters that it did not owe a duty to Plaintiffs to ensure that informed consent occurred based upon the limited nature of the relationship between Advagenix and Plaintiffs (Doc. 128, p. 10-12). *See Siwa v. Koch*, 902 N.E.2d 1173 (Ill. App. 2009). Necessarily then, the Court's analysis hinges upon a determination as to whether Advagenix owed a duty to Plaintiffs to obtain or ensure informed consent occurred, based upon the specific relationship between Advagenix and Plaintiffs.

As a preliminary matter and contrary to Advagenix's contentions, Plaintiffs' claim against Advagenix was not solely based upon Advagenix's failure to "confirm that written informed consent had been obtained by the codefendants prior to releasing the

results of the genetic testing to plaintiff's physician, Dr. Cooper." (Doc. 128, pp. 10-11; *see also* Doc. 150, p. 11). Admittedly, one of Plaintiffs' experts stated that his only criticism against Advagenix was its failure to confirm written informed consent prior to releasing the testing result (*see* Doc. 128-12 at transcript pp. 38-39). However, the Court reviews Plaintiffs' claim against Advagenix based upon what was alleged in Plaintiffs' operative complaint, not based upon a snippet of the deposition testimony of one of Plaintiffs' experts (*see generally* Doc. 44). Significantly, as pleaded, Plaintiffs' claim against Advagenix is not so narrow (*Id.*).[2] Consequently, the Court's analysis of Advagenix's alleged duty surrounding informed consent will consider all the ways Plaintiffs allege Advagenix breached its duties involving informed consent, not just Advagenix's narrow construction of Plaintiffs' claim and resulting duty.

> Under Illinois law:
>
> There are four essential elements a plaintiff must prove in a malpractice action based upon the doctrine of informed consent: "(1) the physician had a duty to disclose material risks; (2) he failed to disclose or inadequately disclosed those risks; (3) as a direct and proximate result of the failure to disclose, the patient consented to treatment she otherwise would not have consented to; and (4) plaintiff was injured by the proposed treatment."

*Davis v. Kraff*, 937 N.E.2d 306, 314-15 (Ill. App. 2010) (quoting *Coryell v. Smith,* 274 653 N.E.2d 1317, 1319 (Ill. App. 1995)). Importantly, when considering the first element, a

---

[2] In truth, it is unclear to the Court why Plaintiffs have not further disputed Advagenix's explanation of Plaintiffs' claim against it. The operative complaint alleges numerous ways that Advagenix breached its duties to Plaintiffs, some of which appear to have nothing to do with the issue of informed consent (*see* Doc. 44, pp. 16-18). However, because the summary judgment briefing only focuses on the issue of medical malpractice based on informed consent, the Court has not further analyzed this point.

"physician's duty arises only when a clear and direct physician-patient relationship has been established." *Siwa*, 902 N.E.2d at 1176.

Consequently, the crux of Advagenix's argument is that it did not owe Plaintiffs a duty because there was no clear and direct physician-patient relationship. Advagenix emphasizes that Plaintiffs and Advagenix did not communicate directly at any point (*see* Doc. 128, pp. 6 & 11). Advagenix also states Plaintiffs did not even know which laboratory was conducting their testing (*Id.* at p. 6). Therefore, Advagenix argues it is entitled to summary judgment because it did not owe Plaintiffs a duty as a matter of law (Doc. 128, p. 10).

The Court is not persuaded by Advagenix's arguments. Significantly "[t]he special relationship giving rise to a duty of care may exist even in the absence of any meeting between the physician and the patient where the physician performs specific services for the benefit of the patient." *See Mackey v. Sarroca*, 35 N.E.3d 631, 638 (Ill. App. 2015); *see also Weiss v. Rush North Shore Medical Center*, 865 N.E.2d 555, 557 (Ill. App. 2007) (acknowledging that a special relationship may exist even in the absence of any meetings between the physician and patient); *Slanger v. Advanced Urgent Care, Ltd.*, 2022 WL 18000076, at *3 (Ill. App. 2022) ("A physician-patient relationship may also exist even in the absence of any actual contact between the physician and the patient when the physician performs specific services for the benefit of the patient."); *Bovara v. St. Francis Hosp.*, 700 N.E.2d 143 (Ill. App. 1998) (finding the trial court erred in granting summary judgment because a physician-patient relationship may have existed by the physician providing services to the plaintiffs, even though they never interacted); *Lewis v. OSF*

*Healthcare System*, 2022 WL 5240557, at *6 (Ill. App. 2022) ("It is not necessary that the patient and physician have actual contact with each other for a physician-patient relationship to attach.").

Pertinently, Illinois courts have repeatedly determined whether a physician-patient relationship existed (and therefore a duty was owed) based upon a case specific inquiry as to whether the medical professional performed a service for the benefit of the patient, irrespective of if the parties had actual contact. *See Slanger*, 2022 WL 18000076, at *3. For example, in *Lenahan v. University of Chicago*, the decedent enrolled in a treatment plan for his cancer. 808 N.E.2d 1078, 1085 (Ill. App. 2004). The plaintiff alleged the defendant-physician was the sponsor and principal investigator of the decedent's treatment plan and had designed the plan, including setting eligibility criteria, pretreatment evaluation, and the treatment itself. *Id.* The defendant collected, analyzed, and charted the decedent's T-cells. *Id.* The defendant also selected and directed the decedent's chemotherapy regime. *Id.* However, the decedent never personally met the defendant. *Id.* The trial court dismissed the plaintiff's claims alleging defective consent against the defendant because it believed the defendant did not owe a duty to the decedent. *Id.* On appeal, the appellate court reversed and held that based upon the services the defendant performed, a special relationship and corresponding duty had been established. *Id.* at 1086.

In contrast, Illinois courts have found no duty was owed in instances where the defendant did not take an active role in the plaintiff's treatment. *See Siwa*, 902 N.E.2d at 1176; *Reynolds v. Decatur Memorial Hosp.*, 660 N.E.2d 235, 240 (Ill. App. 1996). In *Siwa*, the

plaintiff volunteered to undergo a CT scan to help test a new software being installed for the hospital he worked at. 902 N.E.2d at 1175. The defendant-physician worked for a radiological company that was conducting the testing for the hospital. *Id.* The defendant did not know who was volunteering for the testing prior to reviewing the tests. *Id.* However, upon reviewing the plaintiff's test results, the defendant realized that he knew the plaintiff and observed that the plaintiff's test results were abnormally high. *Id.* The defendant then spoke directly to the plaintiff on two occasions and strongly urged him to go see a cardiologist. *Id.* The plaintiff died before he was able to attend an upcoming cardiology appointment. *Id.* On review, the appellate court readily distinguished the case from those where a duty was found to exist based upon the specific facts of the case. *Id.* at 1177. The appellate court found it dispositive that the defendant never performed a service specifically for the plaintiff and came across his "results by happenstance while engaging in the testing and training exercise regarding the new equipment and software." *Id.*; *see also Reynolds*, 902 N.E.2d 238 (no physician-patient relationship was established where the patient did not seek the physician's medical advice and the physician did not knowingly accept that person as a patient).

      Again, regardless of how Illinois courts have ruled when confronted with case specific facts, the key question is always whether the defendant performed services for the benefit of the patient. *Lenahan*, 808 N.E.2d at 1086. In fact, in *Bovara*, the court favorably referenced out of state cases where a physician-patient relationship was found to exist between a patient and a radiologist who had no actual contact, so long as the radiologist performed a service for the benefit of the patient. 700 N.E.2d at 147. Even cases

such as *Siwa* and *Reynolds*, which have held no special relationship existed, have limited their holdings to situations where the facts demonstrate that the physician did not provide a service to the plaintiffs. *See Reynolds*, 660 N.E.2d at 239 ("A consensual relationship can exist where other persons contact the physician on behalf of the patient, but this is not a case in which [the defendant physician] was asked to provide a service for [the plaintiff], conduct laboratory tests, or review test results").

In this case, although Advagenix has gone to great lengths to argue that no relationship exists, the facts demonstrate otherwise. Advagenix performed an important service for Plaintiffs in testing their embryos for genetic abnormalities. Advagenix knew it was conducting testing specially for Plaintiffs and chose to provide them with that service. Additionally, it is undisputed that Advagenix was paid for its services (Doc. 150, p. 5). "The central inquiry is whether the physician has been asked to provide a specific service for the benefit of a specific patient." *Mackey*, 35 N.E.3d at 638. Accordingly, Advagenix's active role in conducting pre-implantation genetic testing for Plaintiffs created a relationship and corresponding duty related to informed consent under Illinois law. *See Lenahan*, 808 N.E.2d at 1085. Advagenix's first argument does not entitle it to summary judgment.

  II.  *Reasonable Couple Evidence*

Advagenix also contends it is entitled to summary judgment because Plaintiffs have not put forth any evidence as to what a reasonable couple, having been adequately informed, would do in Plaintiffs' position (Doc. 128, pp. 12-16). Advagenix claims the only relevant evidence regarding what a reasonable couple would do is the

uncontroverted testimony of Dr. Cotter that a reasonable couple faced with a 95% to 99% likelihood of having a normal child would have proceeded with the transfer (*Id.* at p. 13; Doc. 128-14 at transcript pp. 83-84). Accordingly, Advagenix argues that with no contrary evidence to consider, it must be granted summary judgment on this point.

This argument goes to the third element of a malpractice claim based upon the doctrine of informed consent. *See Davis*, 937 N.E.2d 306, 314-15 (Stating the third element requires demonstrating that "(3) as a direct and proximate result of the failure to disclose, the patient consented to treatment she otherwise would not have consented to[.]").Critically, when analyzing the third element of this type of action, the key question is, "[w]ould a reasonably prudent person in the plaintiff's position, after being properly informed, have nonetheless proceeded with the proposed treatment?" *Coryell*, 653 N.E.2d at 1319.

The Court disagrees with Advagenix's claims for several reasons. First, as was discussed at length in the Court's Order on the expert related issues (*see* Doc. 156), Dr. Cotter's testimony as to what a reasonable couple would do is impermissible because it is a legal conclusion rather than an expert opinion. *See RLJCS Enterprises, Inc. v. Prof. Ben. Tr. Multiple Employer Welfare Ben. Plan and Tr.*, 487 F.3d 494, 498 (7th Cir. 2007). Consequently, Advagenix cannot rely upon Dr. Cotter's impermissible (and now stricken) testimony as evidence on this point. *See, e.g., Webster Bank, N.A. v. Pierce & Associates, P.C.*, 2020 WL 616467, at *5 (N.D. Ill. Feb. 10, 2020) (prohibiting an expert witness from testifying that the defendant's actions were an egregious violation of the standard of care because that issue is for the jury to determine). Furthermore, the Court

notes the obvious inconsistency in Advagenix's argument that it is entitled to summary judgment as it presented the only evidence, by way of expert testimony, as to what a reasonable couple would have done—while also arguing that "[a]ny opinion by plaintiffs' experts that plaintiffs would have foregone the transfer had Advagenix gotten written proof of informed consent would be pure speculation." (Doc. 128, pp. 18-19).

Additionally, Plaintiffs were not required to provide expert evidence to establish this element. *Coryell*, 653 N.E.2d at 1320. "Expert evidence is required to support a charge of malpractice when the assessment of the alleged negligence requires knowledge, skill, or training in a technical area outside the comprehension of lay persons." *Id.* However, in an informed consent action, so long as the jury has been educated as to what information the physician should have disclosed to the plaintiff, the jury is in the best position to determine whether the alleged undisclosed information would have altered the plaintiff's decision. *Id.*

For example, in *Crim ex rel. Crim v. Dietrich*, the appellate court was tasked with determining whether the trial court erred by entering a partial directed verdict on an informed consent claim when the only "reasonable person" evidence presented was a statement from the plaintiff that she would have opted for a C-section had she known of the risk of complications that could arise from the natural delivery of a large baby. 67 N.E.3d 433, 435-36 (Ill. App. 2016). Ultimately, the appellate court relied on *Coryell* and held that when dealing with issues of informed consent, the plaintiff's testimony as to what she would have done was sufficient. *Id.* at 440-41. The court explained that the plaintiff had presented competent evidence that: "(1) an alternative to the natural birth

procedure existed, (2) the alternative procedure could have mitigated the injuries [the plaintiff's son] sustained, and (3) [the plaintiff] *testified that had she been advised of that alternative, she would not have proceeded with the natural childbirth.*" *Id.* at 441 (emphasis added).

Similarly, Plaintiffs in this case have provided sufficient evidence demonstrating that: (1) an alternative existed by way of not having a child or adopting; (2) the alternative would have avoided the injuries Plaintiffs sustained; and (3) Plaintiffs would not have proceeded with the testing or implantation had they been advised of the risks. Plaintiffs have both submitted affidavits in response to Advagenix's motion for summary judgment that state they would not have proceeded with the pre-implantation testing or implantation had they known of the risks (Doc. 150-2; Doc. 150-4).[3] Additionally, John Cordes stated during his deposition testimony that he wanted to ensure he was going to have a child without issues (Doc. 150-1, pp. 15-16). Plaintiffs also testified to believing that the pre-implantation genetic testing was perfectly accurate (Doc. 150-1 at transcript pp. 13-16; Doc. 150-3, p. 43). Based upon this evidence, Plaintiffs have presented sufficient evidence to create a triable issue on the objective, "reasonable person" standard required to satisfy the third element of a malpractice action based upon the lack of informed consent. *See Coryell*, 653 N.E.2d at 1322; *Dietrich*, 67 N.E.2d at 441.

---

[3] A party may rely upon an affidavit to oppose a motion to summary judgment so long as the affidavit is "made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." FED. R. CIV. P. 56(c)(4).

Consequently, Advagenix is not entitled to summary judgment based upon its second argument.

III. *Proximate Cause Evidence*

Finally, Advagenix claims that it is entitled to summary judgment because its failure to ensure Dr. Cooper and the Vios Defendants obtained informed consent did not proximately cause Plaintiffs' injuries (Doc. 128, pp. 16-19). Advagenix argues that Plaintiffs' experts cannot demonstrate that Plaintiffs would not have proceeded with the implantation absent Advagenix's alleged failure to obtain informed consent (*Id.* at p. 18).

This argument is repetitive of Advagenix's prior argument and suffers from the same deficiencies. Specifically, proximate cause in an informed consent action relies on the exact same reasonable person standard already addressed and rejected in Advagenix's second point. *Coryell* explained it best, stating:

> However, what is required to prove the element of proximate causation in an action based upon a physician's failure to disclose differs significantly from what is required to prove that same element in an "ordinary" malpractice action. For example, in an "ordinary" action the issue of proximate causation is frequently raised within the context of a defendant's failure to diagnose, or to timely diagnose, a plaintiff's condition. In those types of malpractice cases expert evidence is generally necessary to assist the jury in determining whether the physician's breach of his duty to diagnose or to timely diagnose proximately caused the plaintiff's injury since that determination usually requires knowledge, skill, or training in a technical area outside the comprehension of lay persons.
> In an informed consent action, however, after they have been educated as to the information that the physician should have disclosed to the plaintiff (element 1), no one is in a better position than the jury to determine whether any alleged undisclosed information would have altered the plaintiff's decision to undergo the proposed treatment had it been disclosed. Moreover, since the issue of proximate causation in an informed consent case relates to what a person of ordinary prudence would do under the same or similar circumstances as those confronting the

> plaintiff, it is even more compelling that the members of the jury, based on their own knowledge and experience, and using their native common sense, understand and determine the issue of whether, after proper disclosure, a prudent person would have nonetheless proceeded with the proposed treatment.

653 N.E.2d at 1321 (internal citations omitted).

In addition, as discussed above, Advagenix's argument too narrowly views Plaintiffs' claim against it. Plaintiffs have alleged Advagenix owed and breached a duty to obtain or ensure informed consent in several different ways (*see generally* Doc. 44, p. 17). Plaintiffs did not exclusively allege that Advagenix's only duty and corresponding breach arose from Advagenix's failure to confirm that Dr. Cooper and the Vios Defendants obtained informed consent before releasing Plaintiffs' test results (*Id.*). However, even if that was all Plaintiffs alleged, as discussed above, Plaintiffs have presented sufficient evidence to create a triable issue for the jury to determine whether a reasonable couple in their position would have continued with the implantation if they learned of the risks of testing inaccuracy immediately before receiving their test results.

Finally, the caselaw Advagenix has cited in support of its argument is inapposite. Advagenix has moved for summary judgment regarding Plaintiffs' allegations related to informed consent (Doc. 128, pp. 16-19). Yet, all the cases cited by Advagenix in this section involve dissimilar types of claims.[4] As explained in *Coryell*, a malpractice action based

---

[4] *See Borowski v. Von Solbrig*, 328 N.E.2d 301, 303 (Ill. 1975) (medical malpractice claim alleging negligent treatment); *Whitman v. Lopatkiewicz*, 504 N.E.2d 243, 244 (Ill. App. 1987) (ordinary negligence claim discussing whether a presumption of negligence arises following the occurrence of a car accident); *Knauerhaze v. Nelson*, 836 N.E.2d 640, 651 (Ill. App. 2005) (medical malpractice claim alleging negligent performance of ear surgery); *Kellman v. Twin Orchard Country Club*, 560 N.E.2d 888, 892 (Ill. App. 1990) (wrongful death action alleging negligence in shower design and maintenance); *First Springfield Bank & Trust v. Galman*, 720 N.E.2d 1068 (Ill. 1999) (wrongful death suit involving question of whether illegally

upon the doctrine of informed consent contains different legal standards and evidentiary requirements than other types of malpractice claims. 653 N.E.2d at 1321. Accordingly, Advagenix's caselaw in support of its position appears to miss the mark. Therefore, Advagenix's third argument does not entitle it to summary judgment.

In conclusion, Advagenix is not entitled to summary judgment and its motion for summary judgment is DENIED (Doc. 128).[5]

## CONCLUSION

Defendant Advagenix's motion for summary judgment is **DENIED** (Doc. 128). A status conference will be set by separate order at which time the Court intends to discuss an additional referral of this case to mediation as well as trial scheduling and logistics.

IT IS SO ORDERED.

DATED:  September 29, 2023

                                             s/ Mark A. Beatty
                                             **MARK A. BEATTY**
                                             **United States Magistrate Judge**

---

parked truck was proximate cause of accident); *Lee v. Chicago Transit Authority*, 605 N.E.2d 493, 502 (Ill. 1992) (wrongful death action); *Simmons v. Garces*, 763 N.E.2d 720, 732 (Ill. 2002) (medical malpractice action involving failure to properly treat decedent); *Seef v. Ingalls Memorial Hosp.*, 724 N.E.2d 115 (Ill. App. 1999) (medical malpractice action alleging negligent failure to monitor); *Reed v. Jackson Park Hosp. Foundation*, 758 N.E.2d 868, 874 (Ill. App. 2001) (medical malpractice action alleging negligent failure to discover injury); *Aguilera v. Mount Sinai Hosp. Medical Center*, 691 N.E.2d 1, 6 (Ill. App. 1997) (wrongful death action involving negligent delay in administering treatment); *Peterson Welding Supply Co., Inc. v. Cryogas Products, Inc.*, 467 N.E.2d 1068, 1072 (Ill. App. 1984) (action alleging loss of corporate opportunity).

[5] As with the expert related motions, the Court recognizes that this summary judgment motion has been pending for some time and the parties have patiently waited on the Court for a decision (*See* Doc. 128). The Court apologizes to the parties for its delay in resolving these motions.